23-7544 Laurie Gardner-Alfred v. Federal Reserve Bank of New York Whenever you're ready, counsel. We understand you'd like to reserve two minutes for Colonoscopy probably. boleh pergi? Good morning. May it please the court. This is an appeal from Summary Judgment in a COVID-19 vaccine exemption case involving two plaintiffs, each with her own claims against the employer. I will begin by explaining why the district court reached the wrong decision with respect to plaintiff Jeanette Diaz. In Ms. Diaz's case, the district court made at least four clear legal errors in finding that she could not prove a sincerely held religious objection to the COVID vaccines. Ms. Diaz is a baptized Catholic who objected to the COVID vaccines on the grounds that they were created using human cell lines derived from abortion. The first legal error that the district court made was discounting the sincerity of Diaz's belief because her views, quote, are different from those held by the church of which she claims to be a member. Now, this clearly violates the principles that this court articulated in the Cain v. de Blasio case just three years ago, where you wrote, denying an individual a religious accommodation based on someone else's publicly expressed religious views, even the leader of her faith runs afoul of the Supreme Court's teaching that it is not within the judicial ken to question the centrality of particular beliefs or practices to a faith or the validity of particular litigants' interpretations of those beliefs. Well, the judge recognized that you can even be – I don't know that he used these words, but you can be a heretic. I thought his point was more looking for some indicia that she actually believed what she purported to believe, and he went through various criteria. And then at the end, he said, well, let's see. Maybe she's invoking something that a religious group has espoused. Well, I don't see that either. So, I mean, that mode of analysis is not forbidden, right? I mean, if you say, look, hypothetically, I find no evidence that you personally have ever espoused this belief, and then you could say, well, let's see, maybe you're invoking this as shorthand for some belief that is adopted by your religion writ large, right? I mean, that would be a way of looking for something that backs up someone's subjective belief, right? Well, yes and no, Your Honor. No in terms of, I think in this case, the judge, in fact, was using this against her by citing, for example, that her pastor refused to sign the exemption letter and otherwise indicating that her views were contradictory to the archdiocese of Newark. But in terms of is there affirmative evidence supporting her views, yes, her own testimony. That's the fourth clear legal error that the judge made here. Well, maybe would you help us? You're going to go through four. Would you do a quick checklist? Just give us the headlines of what those four errors are so that we know what major points you're going to hit and then we may focus on one or two of them. First, discounting the sincerity because they were in conflict with the views of her church and her pastor. Second, discounting her sincerity because she also demonstrated a secular interest in avoiding the vaccines. Third, discounting her own testimony on the grounds that it was simply conclusory and self-serving say-so. That, I think, goes to the point you just made. And fourth, improperly, closely parsing Ms. Diaz's testimony, construing it against her, and then reaching the conclusion that her objections to the vaccine do not, in fact, conflict with the mandate. So can we just take that last point? And you tell me whether I'm accurately characterizing what I understand her argument to be in that last point, that when she testified, and please correct me if I'm wrong because I think the words matter, she said that she opposed taking a vaccine that had been produced with, manufactured with, or contained the aborted fetal cell lines. And I understand that her argument would be, well, look, produced with is what I understood produced with, meaning not literally on the assembly line in the manufacturing plant that they have these aborted cell lines. But in the process of creating and generating and making this, whatever stage of whatever lab it is, this was a contributing part of the process, which would include the R&D. And that if she's saying produced with, let me put it this way, at this stage of the game, drawing all reasonable inferences in favor of her as the nonmoving party, a reasonable jury could understand her to mean that she was including the R&D process. Is that roughly her argument? Or if it's not, correct me. Well, that's rough, but it's not complete because that wasn't the only thing she testified to. She also testified specifically about vaccines derived from aborted fetal cells. She used the word derived. Give me the page citation. Sure. Because the page citation is actually the judge's own decision because he cited that in the ruling. The quote, it's on page, let me just get it. The district judge even quoted this testimony. It is on page special appendix 27, page 16 of the judge's decision. He quoted her testimony specifically when she was asked, well, how is it that you disagree with the Catholic Church on this issue? And she testified in testimony that the judge included in his decision, because the Catholic Church teaches that I am to follow my moral conscience and because the Catholic Church also teaches that it's pro-life. And the Catholic Church also teaches on the 15th. Well, the derived from, help me out here, this is docket number 164. Are we referring to the, what is it the district court is citing here? It's 164. I just want to map this out. Is that her complaint? No, I'm looking at the district judge's actual decision. Yeah, I know, but then he cites. Oh, no, that's deposition testimony. So what is the paragraph 39? I just want to make sure I'm looking at the right thing. Yeah, the deposition testimony is on page. That's her rule 56.1.  I'm sorry, say that again. A1226 is her actual deposition testimony. 1226? 1226. Okay, because I think what I'm looking at here is his citations were the rule 56 statement, and that's why I'm trying to drill down to the testimony. Yes, there's actual deposition. To see what her words were, because that's the evidence. That is actual deposition testimony which the judge himself even cites in his own decision. But instead of accepting the truth of her testimony and construing it in the light most favorable to her, he engaged in a completely improper parsing of the language that Diaz used. Wasn't she asked what she meant by derived specifically? I'm not sure if that was specifically discussed in the deposition testimony, but we have a situation. This is summary judgment. The evidence is supposed to be construed in the light most favorable to the plaintiff, and the Supreme Court told us in the Thomas v. Indiana Review Board case that courts should not dissect the views of litigants who may not articulate them with the same level of precision that Mr. King personally wanted. We're slicing the bologna very thin with no disrespect to religious doctrines. We're slicing the bologna very thin. If we're going to say that it matters whether she said derived or manufactured, she's not a theologian. She's an administrative assistant. Theologians can debate how many angels can sit on the head of a pin. They could distinguish. A theologian might say, well, there's a difference between actually incorporating the cells from an aborted fetus into your vaccine and using the cells from an aborted fetus in research and development. It's a little hard for me to say that someone who is neither a biochemist nor a theologian is going to be held, as the district court did, to making a distinction that she used the word manufactured. Oh, my God. And this was not part of the manufacturing process. So, huh, she doesn't actually believe what she says she believes. Or this isn't in contrast with what she says she believes. That strikes me as a rather peculiar thing to do on summary judgment. That's exactly right, Judge Lynch. And I think there's even something more going on here in that we have a situation where, in effect, the judge is questioning the verity of Ms. Deans' views in terms of her understanding that there is a connection between abortion and the vaccines. A connection, by the way, which this court. Well, I thought she was slicing her objection very thin to say, and this is I'm looking at page 28 of the special appendix, book number nine. I thought this is where, I guess in your view, he's slicing her objection thin to say, no, no, no, her only complaint is that the vaccines contain fetal cell material and she admits that they weren't manufactured with. So I guess if you narrow her views and then you say, and that's not true, because that is simply a fact. That's not judging her religious views. Right. This is a separate issue than the sincerity of her belief. The whole last point that we've been talking about for the last couple of minutes is all about whether there is a conflict between her professed views and the vaccination. And that's where things are being sliced remarkably thin. That's not about the first issue, which is are her beliefs sincere. Is that right? I believe that is exactly correct. Can I then go back to the first issue and go back to the Catholic Church? It seems to me that I'm not going to anticipate what the other side is going to say, but I wouldn't think anyone can disagree at this point that the fact that her views do not match those of the hierarchy of a particular religious sect, even one that she professes adherence to, cannot defeat her claim of sincerity. What I'm wondering, are you contending that that's not even admissible on the question of sincerity? That if we had a trial here where a jury or other fact finder is asked to decide, is this really what she thinks or is this not really what she thinks? Does that not even factor into the equation? Is that like just flat out inadmissible, can't think about that at all? I think to the extent that in her own, to the extent that the facts of the case and what she did and who she spoke to, that that is relevant to understanding her claim and that gets presented at trial, then it would be admissible. But to the extent that someone is going to bring in independent evidence to say, ah, but your views conflict with the views of the court. Even if it's not independent evidence, even if it's there, you'd say there should be a limiting instruction that says that can't be considered on the issue of sincerity? Well, that would have to be in the jury instructions, Your Honor, for sure. That's what you're suggesting. Absolutely. That cannot be considered. I mean, I think this is a black-letter law for decades, that an individual's religious views, including the sincerity of that person's views, can't be judged based on whether they are consistent with some other religious leader or some other religious group. And when we get to the question of her other practices, I mean, one thing, you disclaim the argument that, I think you disclaim it, that once she has testified that these are my sincere beliefs, that in itself is enough to get you past summary judgment. Are you maintaining that or are you not, just to get that? As a general rule, as a general rule, I would say that if the plaintiff who has no knowledgeable, competent testimony as to what their person's beliefs are and says that they are sincere, that that has to be credited on summary judgment. So that happens, for example, in civil rights cases all the time. Six or seven police officers say it happened one way, but the alleged victim says, no, it didn't. It happened a different way. What if the plaintiff was on audio tape or video tape telling someone else, here's how we're going to get out of this vaccine. We're going to pretend to be religious. Here's how you do it. Here's how I'm doing it. You're not a Catholic, so you may have to do it a different way. But the idea is that kind of thing could conceivably at least. Well, I think we do recognize exceptions for dispositive video tape and audio tape evidence, which is capturing something in the moment, for sure. But that's not what we have here. Yeah, what we have here are things like, well, you take other medicines. Did you ever look into this issue? And that may be a relevant question on cross-examination, but it's not dispositive. But that's not dispositive, because after all, there are plenty of people who believe, or at least believed when I was a child, I guess the rules have changed, that you simply can't eat meat on a Friday. And I suppose if those people were in a prison, they would ask for a meatless meal on Friday. It wouldn't be valid to say, aha, but we have video tape of you eating a hot dog at a baseball game once. Because people can be tempted to do things that they don't want to be compelled to do and that they believe are sinful. Yes. Correct, Your Honor. And the law doesn't require perfect consistency. And to the extent consistency is a relevant factor, that's an issue for cross-examination, for the ultimate fact-finder to make a determination. If I'm going to spend one more minute. Yeah, I just wanted to. So just two points. Just to clarify, you are not saying that an issue of this kind, someone's intent or sincerity, cannot be determined at the summary judgment stage. I get the impression you're saying it should be very rare, but you're not suggesting that this is not something that could be appropriately determined on summary judgment. That's correct. I'm not saying that as a categorical matter it can never be decided, but it certainly cannot be decided in Jeannette Diaz's case. Okay. So my follow-up is, and I think this was one of the points you were going to hit on, the idea that you characterize the district judge as pointing to the fact that she had also secular reasons for being opposed to the vaccine. And I think, to the extent of what the district court is saying, I find that that is actually what's motivating this, not the religious motivations. In fact, you have secular reasons, and I think the judge characterized it as you're addressing it in a religious regard. If you could just speak to how those other things that the court is pointing to that suggest there are reasons, either the e-mails or the, and I hope I'm not getting the plaintiffs confused, talk about the fact that there was this opposition to the vaccine before a religious accommodation was requested. Thank you, Your Honor. This is another fundamental error that the judge made here. He did make a factual finding looking at the religious and the political and concluding it was political. But even the consideration of the political was misguided, certainly at this stage. Supreme Court precedent teaches us that a person can be conscientiously opposed to war, if we go back to Seeger and Welsh, while at the same time having very strong political views, and in fact can have both of those views at the same time. EEOC guidance tells us that the mere overlap of a political view and a religious view doesn't take it outside the scope of Title VII's protections, and the First, Seventh, Eighth, and I believe the Sixth Circuit, in COVID-19 cases, have all said just because the person also has political views that may be against the vaccine doesn't inherently discredit their religious objections to the vaccine. And I have to say there is a First Amendment problem here, because the judge is actually saying that we can scrutinize a person's media interests. We can scrutinize a person's political discussions with colleagues and with friends. And, you know, we're going to criticize someone for subscribing to newspaper e-mail lists, the Epoch Times. Epoch Times is a legitimate newspaper. Subscribing to e-mail lists from Children's Health Defense. Children's Health Defense is a legitimate organization. Robert F. Kennedy, Jr. has been nominated to be secretary of HHS. I understand your point, but I think that doesn't exclude the possibility of a case, and you may not think this is the case, where someone scrutinizes the e-mails and messages and videotaped discussions of a particular person which manifest exclusive secular objections to something, and then out of the blue they give a religious articulation for their objection, which is completely inconsistent with their past and subsequent behavior in which they are utterly unable to explain what exactly is the nature of this religious objection. It is not inconceivable that a fact finder at an appropriate stage could conclude that someone only has a secular objection to something and that the religious objection is in fact contrived and they don't actually believe it, right? I mean, and you can go through that investigative mode of looking at what they have said and what they read and what they do to reach that conclusion. I understand you're saying in this case they should not have, but that it's not an exercise that is impermissible. It's not an exercise that's impermissible, but I think it needs to be handled carefully. I think the idea that the nature of someone's political life can be scrutinized and then held against them with respect to their religious beliefs is problematic. That's right. Can I ask you then, because we are keeping you up, but this is interesting. Could you turn your attention to the other plaintiff? Because we have been talking about Ms. Diaz for a bit. I do think that the record is distinct as between the two of them as to what they have said and done. And in particular, you have the problem with Ms. Gordner and Alfred. How do you deal with the record as it developed in her case, for example, effectively buying this certificate off the Internet and then giving the most implausible possible story about how she got it? As Judge Lyman found in imposing discovery sanctions, it seemed very clear that she was making up the story on the spot. She didn't know how she got it. She had testified in her deposition that she had sent money over cash appraisal. Then when she comes back in the discovery, she never turns anything over. Then at the discovery hearing, she starts spitting a, frankly, facially implausible tale of, well, I think I met some guy in Brooklyn somewhere who I didn't know who he was. I don't remember where it was. I gave him some money. I mean, it's facially implausible that she just did this. Why is it not so implausible that that is one of these cases where it seems to fit the paradigm that even the Supreme Court has acknowledged, where there are some people who will simply lie to make up a religious justification for something they don't want to do for secular reasons? So maybe could you point us to the record evidence that she actually had a religiously-based objection to this? Because I can see that more with Ms. Villes. I'm having a lot more trouble, I'll tell you, with Ms. Gardner. Well, in terms of the religious basis, the judge didn't question that. He questioned, again, her sincerity. He didn't question whether the truth is true. That's what I mean, that she was just making it up. And part of it is based on her telling, hiding the discovery, not turning things over. Apparently, I mean, it just seems like a facially complete lie on her part about how she got this thing that superficially holds itself out to be representation of her religious views, and it seems like something she just bought for money. And she couldn't tell us a blessed thing about the Temple of the Healing Spirit? With respect to the vaccine exemption package, I think, yes, there are some questions surrounding how she came about getting the package. There are no questions that the package exists, that the church exists, that the church provides that package in order to assist people in order to try to get exemptions. All sorts of organizations throughout this time did that. I think there's a certain element of there's something discreditable about this particular organization. Liberty Council, a very reputable public interest law firm. But unlike the other councils and the other people who do this, an investigator called up that church, answered their ad on their website, and said, send me the package, here's $500. And that's what happened, and he got it, the same package that she got. And I can go to Liberty Council's website and get their stuff right there, sample letters, sample all sorts of things. All sorts of organizations provided this. Now, look, I'm prepared to at least entertain an argument in the form, a person who has a genuine religious belief that is perhaps unique to herself and her own conscience might fear that people won't believe her, and so might think it's a good idea to go to some scam minister and get a stamp of approval. That's gone a long way, but I can sort of imagine that as raising an issue of fact. But you're telling me that there is no scam here, that a reasonable fact finder could find that she really did believe the things that are in this letter, and that, as she said in her deposition, she believes those things because she belongs to that church, that she never attended, has no evidence she knows anything about it, that she's never seen any of their services, she's never gone to anything with anybody who's in that church? We're getting pretty far out. I think, Your Honor, that there is a considerable amount of impeachment evidence with respect to her membership in this particular church. But there's a distinction between membership in the church and the beliefs, and the beliefs that she expressed in this particular case. And I would point out that, you know, both Jeanette and Lori, they applied for exemptions. They were interviewed by HR, and then they were approved. And initially they had that interview. They explained the basic reason why they objected to the vaccine, and HR at the employer approved them, and they were approved for many, many months. But the views of the Fed's HR department don't reflect one way or the other on whether these folks had a sincerely held belief, do they? I mean, are you saying that what they think matters to whether your client believes something? That seems very odd because then it seems the contrary would be true, that if they had rejected the accommodation, that would be evidence against your client. It seems to me that that's utterly irrelevant. Your clients believed it or not, regardless of whether they at different points agreed or disagreed. Yes. It seems odd to think that their views reflect on what your clients believed. Not entirely because the issue in this particular case is sincerity, and we have an example in the record where they explain their views to HR, and HR found them acceptable to grant a accommodation. Well, it seems like there the argument would be they have consistently expressed these views. Therefore, the more often they have said them, the more likely they are to believe them. Well, these are the views from the But whether somebody else agreed with them seems sort of an odd factor for us to consider in whether your clients objectively believed it. Well, except that we're trying to decide here, based on all this evidence, whether a reasonable person could basically believe that Ms. Gardner, Alfred, has an actual religious objection to the vaccines, that it was sincerely held. And we're looking at all the different evidence, and we're trying to make that determination. And what I'm saying is that I'm trying to imagine this at a trial, right? You put on – you bring in somebody. Here's Mr. Jones. Mr. Jones, who are you? I'm just a normal guy. You're reasonable? Yeah, I'm a reasonable person. Did you talk to her about her beliefs and she told you this? Yeah. Did you believe her? Yes. See? A reasonable person thinks that. That's not evidence, right? If they're an HR professional, could they – it's not just Mr. Jones, reasonable man on the street. It's Mr. Jones, I'm an HR professional. Oh, you are? What do you do for a living? Oh, I interview people to decide whether they qualify for this exemption. And did you interview my client? Yes. And did you believe her? Yes. That's admissible? If it's the actual facts of the case, of course. We're going to present the chronology of what happened. We're going to call the HR witnesses. They're going to testify about the interview. They're going to testify about the investigation. Assuming that that somehow gets to be relevant, there's not going to be an instruction from the judge that, ladies and gentlemen, you are not to consider their opinion as evidence of what is true, what the person actually believes. You think that is evidence of what the person actually believes? I think it's circumstantial evidence. But the people higher up at the Fed evidently overruled that. So can they bring themselves in and come and say, hey, we didn't believe her? They are. They are going to do that. But would that be probative? Wouldn't you argue? I would think you would argue that's not probative. They can't argue that because HR executives so-and-so disbelieved my client. That's probative, ladies and gentlemen, of whether my clients themselves believed it. I mean, how could you possibly accept that premise? I think that that is one of the things that make this kind of case complicated because you have to explain the story from both sides. Explain the story, though, is one thing to show why they got an accommodation, why they were refused an accommodation. And the refusal is, in fact, the violation you're alleging. But to suggest that someone else's views are probative of the predicate fact of whether your clients believe something's a dot, I think we may have taken you considerably past the original time. We appreciate that. Why don't we hear from the other side? And you have reserved two minutes. We'll hear from you again. And why don't you go ahead and raise the podium just a little bit because the closer we get the microphones, the better. Thank you, Your Honor. May it please the Court. Alex Leonard on behalf of the Federal Reserve Bank of New York. Now, the Supreme Court said in Burwell v. Hobby Lobby that Congress was confident in the ability of the federal courts to weed out insincere claims. That is the function of summary judgment, and that is exactly what happened in this case. So let me just cut right to one of the key points for me, which is we have to draw all reasonable inferences in favor of the nonmoving party. So let's take Ms. Diaz right here. She testified at 1227 of the appendix that she objects or she thinks that it would be contradicting her beliefs to use a vaccine that's derived from aborted cell lines. She testified to that. I'm reading that out loud. Why is it that the Court did not err when it said that Diaz testified that her objection was to vaccines that contain fetal cell material? Again, if we have to construe any ambiguities in favor of the nonmoving party, why are we to read her testimony that she objects to a vaccine that's derived from as meaning that contains pieces of? Tell me that. Answer that narrow question first. Yes, Your Honor. So that was, this is on the burden point, which is separate from the sincerity point of both plaintiffs. On burden, Ms. Diaz did early in her deposition have this quoted testimony. She then was asked over a seven-hour deposition repeatedly to explain herself. She was asked the following question. Do you object to all vaccines? She said no. The question was what vaccines do you not object to? And she said the ones that do not contain aborted fetal cell lines. But then she also said produced with, manufactured with, right? So she has various verbal formulae that arguably conflict with one another or arguably cover a range of things. Why is it that construing all inferences in her favor, we only pick out the limiting inferences and not the broadening inferences? So, Your Honor. About what the nature of her objection is. So what Judge Lyman did was he both took her at her word when she said contain, manufactured, or produced with, and importantly he looked at her 56.1 response. These plaintiffs were represented by counsel, were here on summary judgment. It was put to them directly in the record at A1206, paragraph 41. The following proposition is undisputed. That she has no objection to vaccines that don't contain aborted fetal cell lines or are not manufactured with aborted fetal cell lines. So the question is how do we read manufactured with? And it seems to me that, again, construing all inferences in favor of a layperson who doesn't really understand, you know, exactly what the contours of manufacturing are, and it seems to me a layperson can think that manufactured with doesn't mean, like, after they've developed it and only when you're on the assembly line filling the little test tubes whether the fetal lines are being used there. Why are we holding her to this sort of hyper-scientific precision? So two points, Your Honor. First is that when, by the time she was presented with that 56.1 statement, this was squarely an issue. It's not a trick question. It's not a gotcha moment. She didn't say manufactured in my mind. Because the question is when she admits that, what is she admitting? Manufactured with. There's no line that says, and by manufactured with, I understand that to exclude research and development. She didn't say that, did she? Well, her words were contain or manufactured with. Right. Either or. Either or. You're saying that or means synonymous? If I say I like, I will eat a hot dog or a hamburger, I'm suggesting to you that I view hot dogs and hamburgers as synonymous? I've used or. No, Your Honor. So then how is it that you say that she objects to something that contains or is manufactured with to mean that contained and manufactured are synonymous? They're not synonymous. Okay. So then contained is out of the picture, and we're back to what I asked you, which is why should we construe her use of the word manufactured with narrowly to exclude part of the development process? Because, as Judge Lyman noted, she had the opportunity to explain, as Your Honor is suggesting here, that she had some objection to it in the testing phase, but she didn't explain that. Why did she have to? The question is, is it ambiguous? And what can we find in terms of a permissible inference before the jury? Why is it not a permissible inference that she manufactured with as sort of a big-picture thing, that it doesn't have to be in the test tube, it doesn't have to be in the needle, but it can be something that was used to develop this thing? She never suggested that that was her view, so that's the reason why. Why would a person even think of that? I mean, you know, people are – and this includes atheists and the secular humanists among us as well as religious people – people don't parse everything that way. It seems to me that if you get the notion that somewhere in the background of this product is an abortion, and you think that that's an abomination, and you will not participate in that, and you say, I don't want to have anything to do with a product that is manufactured with aborted fetal cells, and then you tell this religious person, oh, don't worry, it's not really manufactured with. And she says, oh, really, so I'm okay? But you don't say, oh, but we did use the aborted fetuses to get the permission to sell it in the first place. We used aborted fetal cells in order to develop the understanding of how this works. And you think – and that person clearly would say, oh, okay, you're good, I haven't got a problem, if they were really being sincere. I mean, that's ridiculous. Well, Judge Lynch, just as we need to take her beliefs, no matter what they are, just as she says them, so too we need to be able to take her beliefs as she expresses them. And if there is clearly at issue in the case the question of testing versus manufactured, like there was in this case, and there certainly was at least by the time this was put to her in the Rule 56.1 statement, she had the opportunity, as Judge Lemon found, to correct it. But wait a minute. You say she has no objection to vaccines that are not manufactured. If she believes that R&D is subsumed within that, then she should respond as she did undisputedly. Why does she have to then slice it and dice it? If she agrees with it, she agrees with it. You may disagree with what she meant when she disagreed with it, but she's got a different view of what that means. Why does she have an obligation to you to, what, say, well, I think you actually understand manufacturing to be something different from what I understand. If she has an understanding of what it is, then she agrees with it. Your Honor, I think that she has an obligation to express her objection. She did so in the district court. She doesn't object. She's fine with things that are not manufactured. Was she ever asked the question, suppose there were a vaccine that, in the research and development phase, the scientists involved in trying to find a vaccine that would work went out and aborted a bunch of fetuses, brought them into the lab, brought their cells and tissue material into the lab, and then tested the vaccine in some way that made use of that tissue. Would that be okay with you, with your religion? Was she asked anything resembling that? She was not, Your Honor. But let me make one thing clear. She testified that she did not recall checking whether these vaccines were manufactured or contained with her.  She didn't recall checking. She had no evidence that she has ever acted consistently with this belief. And we've been talking a lot about burden. Actually, let me put you to something. Yeah. She signed. Yeah. In appendix 5354, it's her religious objection that she filed, right? And she downloaded something from the Colorado CAFA conference and then she brought to her pastor, right? She talked to her priest and she said, This is what I want you to sign. And then she talked about it with him and he said, Well, I'm not going to sign it. And she said, Well, I am going to sign it. And then she submitted it. This contains a discussion and actually uses the line that there's a moral duty to refuse the use of medical products, including certain vaccines that are created using human cell lines derived from abortion, which tracks her deposition. So we know that there are at least two instances where she read through this, right? Once talking to her priest. And then once when she decided she was going to submit this on her own, contemporaneous with the interposition of her religious objection. And it tracks what she later says in the deposition about an objection to the vaccine's use. Why is it that this is not at least enough to create a factual issue? Your Honor, because this is part of the course of conduct that shows extrinsic evidence, as this Court recognized in the Krishna Karshnes v. Barber case, of hiding secular objections behind a veil of religious doctrine. Why is it hiding? She went to a priest with this first and said, This represents my beliefs. Your Honor. The first person she testified she went to with this document was to a priest. Wouldn't a jury not be able to say, Well, gosh, if she took this, which purports to be a document outlining religious views, first to a religious person, would a jury not be able to say, Well, gosh, she apparently, because she did subscribe to it, does think that this is a religious view and not a secular view. Well, first she went to a webinar where she was given a toolkit, just like Ms. Gardner-Alfred's vaccine exemption package, on how to avoid vaccine requirements. Yeah, yeah. She's got all kinds of secular. She went for medical exemption first. Correct. So she has. But why is that not consistent with having both a secular and a religious objection? So she could not produce one example of ever having not taken another medication or vaccine that was produced with containment. Focus on this one first. I get it. You have other evidence that you're going to say that she never had previous examples of it. But focus on this letter. I don't get why this letter doesn't get her over summary judgment. Why the letter from the Colorado Conference? I mean, this is just the Catholic Conference. This is just the three Catholic Dioceses of Colorado just joined together, right? I mean, this comes from a Catholic institution, not – I have to say your brief that says an organization with which she had no previous affiliation. I don't even know what that means. This is from some diocese of the Catholic Church, right? It was undisputed by her that she has no affiliation with Colorado Catholic. Well, nobody's got an affiliation with anybody except the diocese where they live. The Catholic Church is not like the Missouri Lutherans versus the other Lutherans or the Southern Baptists versus the Northern Baptists. It's all one church. That's why I thought it was very odd to suggest that this is somehow some kooky group out there that she's got no affiliation with. This is basically a branch office of the religion for which she professes to be a member, right? And it says it lays out the religious teaching. But this is not the religious claim that she made. This talks about – it actually says – She signed it and submitted it. It says in there that a Catholic may choose this. And then she was asked to deposit it. And then the Catholic Church – Is that why you – Well, hang on. It says the Catholic Church teaches that a person may be required. So it says may. Yeah. But it says may be required to refuse a vaccine if they form their conscience in a certain way. She says I form my conscience in this way, and my religion now teaches me that I have an obligation to do it. It says may be, but may be required. So why is that not a – you're saying that's not a religious objection that's articulated in the document? It also says they may choose to take them in the same document. If, depending on how they conscientiously form their own moral judgment, and depending on how their moral judgment comes out, they may be required by their religion to take a certain action. Do you disagree with that characterization of the document? I don't disagree with that characterization. So how is it not articulating what is a religious objection? But this was what was in her complaint, right? This is what she says is the allegation in her complaint. When it comes time for summary judgment, she didn't have other evidence to back this up. It's basically taking what this Court has said is inappropriate, which is just testifying to the allegations in your plea. Well, it's not just testifying. She also has something that she submitted contemporaneously to her employer, right? So this is way before – way before her deposition. And she has testified not just that she submitted it to her employer, but before going to her employer, she talked with the religious leader about it. And, yeah, the religious leader didn't want to go along with it and sign it. Fine. But she persisted. How is this not contemporaneous evidence of what religious views were? Because there's no evidence that she actually ever complied with those views. And she admitted to taking injections, to taking medicines that did not – that she did not check whether they contained or manufactured. Don't people's religious beliefs evolve over time? And doesn't it make a difference sort of what's in the news and what people are talking about that leads someone to think? I mean, I have taken many injections in my life. Some were foisted upon me, thank God, when I was a child so that I didn't get polio. I had lots of injections. It never would have occurred to me for most of my life to even ask the question, wait a minute, do these things derive from aborted fetuses? I mean the nurse tells me there's eggs in here. If you're allergic to eggs, don't take that. Well, I'm not allergic to eggs. I'm good. I don't have any reason even to question. Now, maybe some secular nut comes along with a whole bunch of stuff that makes me worried about COVID and I start looking into the COVID vaccines. And one of the things that's in the literature from the secular people is, and besides, this all comes from aborted fetuses. And then suddenly I think, wait a minute, aborted fetuses. This is a problem for me. I mean, why is it the fact that as an adolescent she got vaccinated against something, or even as an adult, tell us that she can't possibly believe it? It's evidence. I grant you it's evidence. It's something a reasonable fact finder could look at. But why does that say, ah, now we know? That's just like videotape evidence confessing that, hey, hey, hey, I'm going to try and fool them and say I'm religious. Well, Your Honor, here she did try to withhold evidence from the New York Fed and the district court based on the secular nature of her objections. So this whole webinar and the toolkit, that was all only produced on pain of sanction after they withheld it, calling it spam, and Judge Lyman looked at it in camera in the sanctions hearing and found it was relevant in order to produce it. He could have arguably imposed a sanction dismissing the case, right? He could have imposed much more severe sanctions, but he chose not to. So we're at a point where he didn't impose those sanctions. He didn't impose the sanctions saying something like now because you've been hiding it, the sanction will be a mandatory inference that you were hiding it to conceal your lack of a true religious objection. But he didn't go that far. I don't know that he could have. But in any event, he didn't purport to go that far, right? Right. He didn't dismiss the case. So now we have at most a lot of permissive inferences that maybe if you go to trial, you could use as a sledgehammer against the plaintiff and say, gosh, look at all this stuff you were trying to hide. Why were you trying to hide it, ma'am? Because that's what you really believe. That's a pretty devastating cross. But the question isn't whether those are all those permissive inferences are going to fly to the jury. We have to draw every permissible inference at this stage in favor of the plaintiff. So why are we drawing those inferences, which may be great inferences, but they're not mandatory inferences? So, Your Honor, I don't read Judge Lyman's opinion as drawing inferences. I read it as doing what this Court said in Krishna Consciousness v. Barber, which is look at extrinsic evidence outside of the plaintiff's state of mind that she did not act consistently with her claimed objection. And to your question, Judge Lynch, she didn't do any research. Whether it was from a crazy person or other, she didn't get any research or have any sources of news she testified about COVID-19 vaccination when she made her request. But he looked at evidence of inconsistency. And then he also looked at evidence that not only did she stand to hide secular interests behind religious doctrine, but she actually then tried to hide it in the litigation. Can I ask you, because we have kept you up a while, could I ask you to take a little time, just as we ask your adversary, to focus more on the other plaintiff? I think we've been talking about Ms. Diaz principally so far.  But could you just address your views on Ms. Gardner and Alfred and whether you think that there are any distinctions to be drawn? I understand that you think you should prevail as to both, but obviously the records as to the two are unique as to each plaintiff. What are the salient points with respect to this other plaintiff that you think are dispositive? Thank you, Your Honor. So I would submit that, as with Ms. Diaz, Ms. Gardner and Alfred both has significant evidence of acts inconsistent with her claimed beliefs and, as you were discussing before, significant course of conduct suggesting that she was trying to hide nonreligious objections behind a religious one. So she claimed to object to all medications full stop, all Western medications, all procedures. Then she admitted at deposition and in her 56.1 response, and it's undisputed, that over a 10-year period, both before and after, she took medications and underwent other procedures that she considered invasive or Western. Then she purchased paperwork for $475 plus a $12 shipping and handling fee from someone in Florida. I just want to make sure I'm characterizing your argument accurately. One of the points you're saying is that she personally testified that some of the actions she had previously taken at the time she took them, she believed that they violated what she now claims to be her value system. Correct. Okay. And so she purchased this paperwork for someone who sold these, he said, And she offered no evidence, in your view, that even though she claimed to belong to this particular religious group, her inability to provide any information about that religious group at all, about what their beliefs were, who they were, where you meet them, and also she testified in an incredible manner about the payment, left her with basically, in your view, zero as to her religious beliefs. And so zero doesn't get you over the threshold for a summary judgment. Exactly. I think for both plaintiffs, they had opportunities to put forward any evidence showing Ms. Piaz claimed it was her entire adult life, Ms. Gardner-Alfred claimed 20 years. None of them put forward an affidavit of a friend or family member, said, Yes, I know her. This is her sincere religious belief. None of them have any explanation of the inconsistencies in the record or the apparent course of conduct to hide this evidence. And with no explanation, and I would submit no evidence on the other side, I believe Judge Lyman was correct in that, then that's basically just turning the summary judgment standard back into the motion-dismiss standard because anybody can get to a jury. Let me ask you this matter of question, then. Yeah. Let's say we just disagreed with you on the question of how to characterize what manufactured with means, or we disagreed with you or with the district court, which issued an incredibly detailed and thorough opinion. But let's say we disagreed with one point, which was the nature of Ms. Piaz's professed belief, and that we thought that construing her testimony in light most favorable to her, that she did, in fact, object to taking a vaccine that had been developed with abortive-fetal cell lines. Would that be enough to require remand? Or in your view, are there alternative grounds, excepting that, that would require affirmance? So there are, Your Honor. Judge Lyman also found, as with Ms. Gardner-Albert, and he was correct, that she has no evidence to bring her claim of – bring her prima facie case of sincerity to a jury. Remember, they have the burden of proof on this element. And the Supreme Court said in Anderson that in the face of a – Well, let me rephrase. I probably misstated my hypothetical, Ron. Let's say that we take the view that she articulated – this is the following is her belief, that she doesn't believe that she can, consistent with her religious beliefs, take a vaccine that was developed, even in R&D, using abortive-fetal cell lines. Take that as a view that she has adequately articulated that that is, in fact, the nature of her belief. Then how do you get affirmance? You're saying that then you would say that she doesn't actually believe even that? So Judge Lyman ruled that even that, there was no evidence of sincerity. And he also held – Did he do – I thought he said there was no evidence that that was her belief. She said there's no evidence that she sincerely held that belief. And then – I thought he said that that wasn't her belief, that she had a different belief. That her belief was – He's telling me that there are two things that Judge Lyman said. Number one, just like, albeit for slightly different reasons or significantly different reasons, Gardner and Alfred, she does not, in fact, sincerely believe what she said she believed. Correct. Point two, even if she sincerely believed what she said she believed, it's a separate question whether taking the vaccine conflicts with what she says she believed. And since she only said she believed manufacturing, then the dispute is really just about a secular fact of how this vaccine was actually produced. And since it was not produced in a way that conflicts with her professed belief, that's a separate reason for denying her claim. That's perfectly articulated, Judge Lynch. If we change – if we recharacterize her belief, there is no testimony. In fact, I thought the testimony – well, you'll have to remind me. I know that there was enough data put in that there were no aborted fetal cell lines used in the factory generation process of the particular doses. But is there, in fact, a dispute about whether these aborted fetal cell lines were used in R&D? It's not in the record at all because Ms. Diaz, as I was saying before, did not actually articulate that that was her belief. Hang on. Don't fight that hypothetical. Okay. Except for the purposes of argument that she did. My problem there is then how can you say that taking the vaccine would not violate that belief? Assuming, for the sake of argument, that is the way we should characterize her belief, how do you say that taking the vaccine would not violate that belief? I think you don't say that on the burden point. But Judge Lynch is correct that Judge Lyman also found that on sincerity, she did not have what the Supreme Court said in Anderson would need to be in the face of a supported motion for summary judgment, significant probative evidence tending to support the claim. So you're saying that there's not even proof that she believed even that? That she sincerely held that. Yes, Your Honor. Even if you say that she said, and she articulated, that my belief sweeps and derived from and derived from is very broad. You're saying even that she didn't actually believe? Your argument is that all of the evidence that she never researched this question at all about abortion related, that she never looked into that with respect to other vaccines. So her prior behavior is one thing that you would say casts a doubt on the sincerity of her belief because if she felt that so strongly, she should have been doing this research. That kind of thing, the cover-ups of the secular reasons for the belief, all of those things are what you are relying on to say, whatever she says she believed, however you parse that, it's all a cover for secular beliefs. That's point one. The thing about whether the COVID vaccine actually conflicts with her belief is an entirely separate issue and an entirely separate reason relied on by you and relied on Judge Lyman. And if we don't buy that, we should still buy that she is as fake as Gardner-Alfred. And they're both fake. Well, yes, Your Honor, and I just want to make sure I address Judge Nardino's question. In footnote 13 of Judge Lyman's opinion on summary judgment, he points out that even if her objection is to vaccines, because she said she couldn't recall checking, to vaccines that she doesn't know whether they contain or were produced with abortifetal cell lines, maybe she's listening to some of the sources that Judge Lynch was referencing, that even that she can't show a burden with because she didn't check. So he has an alternative holding within the burden inquiry. Then there's the sincerity argument. And on sincerity, they have the burden of proof, and they don't have the evidence besides their allegations. I just want to mention one thing that I think Judge Lyman was very clear on and very correct on, which is that if these plaintiffs, after asserting objections to get out of the requirement, then when it came time to produce evidence, tried to hide that evidence, then all the evidence shows that they actually acted inconsistently, which they've admitted to both before and after their objections, importantly for both of them. And they still can get to a jury just by saying, no, we still say so. That would take all religious accommodation claims to a jury. If we distinguish between Gardner-Alford and Diaz, that would just explode what you just said, right? Because it wouldn't mean that everybody gets there. It would mean that someone like Gardner-Alford doesn't get there. I'm just saying hypothetically. We can take these cases separately, and we look at each one, and we decide whether the volume, and I acknowledge it is a volume of evidence as to each of them, that might cast doubt on their sincerity still is not enough to say that no reasonable jury could believe their testimony. That's just normal summary judgment stuff.  Yes, Judge Lynch. And here, even with Ms. Diaz, because she has the burden of proof, she can't get to a jury without significant probative evidence tending to support the complaint. And Judge Lyman found that on the undisputed record. When a Title VII plaintiff says, this is what the boss said to me, and it's a racial slur or it's a gender stereotype or something, that's not good enough because there's no independent evidence? That's not the law for anything else. Are you saying this is a specific law for religious objections to vaccines? No, Your Honor. The summary judgment standard is the same. And here, they have not met that standard. Judge Lyman pointed out other areas of the law in his opinion where courts do not accept just conclusory allegations to get to a jury. You need some hard evidence. The words have been concrete evidence, significant probative evidence. Like a contemporaneously submitted written religious objection which someone testified without objection that they had discussed with a religious figure a few days prior. So thank you for bringing that up, Your Honor. I think on the – when she submitted this form that she found on the Internet from a Catholic organization, she – That's where we find forms these days. I mean, the Internet is not necessarily a nefarious place. It is not. I might add that one generally files all briefs on ECF nowadays. We try, Your Honor. I trust that none of your briefs are nefarious because they were electronically filed. I certainly hope not. The – she called that in response to the summary judgment motion. Again, this is a record where they had an opportunity. It's all undisputed. They had their 56.1 response. And that form, in response to this colloquy she had with her pastor, she called it at deposition and she admits affirmatively in her Rule 56.1 response that it was a request for a personal exemption, which, to answer Your Honor's prior question, was a third – How is it not personal to her? I'm sorry? Of course it's personal. She's not asking for a blanket exception. But – so she was distinguished –  I'm sorry. It was in the context of distinguishing between personal and religious, which is actually a third ground on which Judge Lyman found against her citing a case – Well, I think we have kept you up considerably past your time, and I appreciate that. Unless there are any further questions, I think we're going to thank you for your argument. And while we hear from counsel, we are going to keep it to two minutes. So, yes. Thank you, Your Honor. Your Honor, I just want to make a couple points about the key case law. The Krishna Consciousness case has language in it, which was also repeated in the Philbrook case. It talked about how you evaluate sincerity. Both of those cases followed bench trials. It was talking about issues that the ultimate fact-finder can consider when making the ultimate decision. The summary judgment precedent that is relevant here is Patrick v. Lefebvre. In that case, what happened there was the district court granted summary judgment. This court reversed because what they said was the district court basically shifted the burden of proof to the plaintiff to put up enough evidence to prove his case in order to be allowed to go to a jury, which changed the 56th standard. And that, I think, is what happened here. The judge expects the plaintiff to do more, like with Jeanette Diaz, more than the forms, more than her testimony, that there has to be some history that a plaintiff can demonstrate going back to some point in the past in order to support their claim to allow it to go forward. And that's not the correct approach. Thank you both very much. Very helpful oral arguments. We very much appreciate the arguments on both sides in the briefing. We will reserve decision.